With the lawyers who are going to argue the case, please approach the bench and introduce yourself and tell me how you allocate time as to the defendants. Good morning, Your Honor. George Lustin for the plaintiffs. Good morning, Your Honor. Aaron Stanton. I represent the Retirement Plan for the CTA, the Board of Trustees for the Retirement Plan, the CTA Retirement Health Care Trust, and the Board of the Retirement Trust. Good morning. Steve Wood. I'm here on behalf of the Chicago Transit Authority. Okay, have you guys worked out something as to the time? Yes. Okay. All right, that's fine. And you'll have some time for rebuttal. Wait a minute. For the plaintiff. Okay, let's proceed. Thank you. Good morning, Your Honors, and may it please the Court. My name is George Luskin, representing the plaintiffs in this case, retirees and employees of the Chicago Transit Authority, and proposed classes of approximately 14,000 participants in the CTA retirement system. Let me ask you a question. What is your position on the employees who are not or are not members of the transit unions? Yes, Your Honor. If you're addressing the standing issue for those employees, those employees who are not represented by the transit unions, it was impossible for the transit unions in the then-arbitration award, the 2007 Wage and Working Condition Agreements to waive their rights. No, what I'm looking for, are they treated the same way as the union employees? Yes, Your Honor, they are. Okay. So, Your Honor, in this case, the circuit... You have two separate classes, too. You have employees, current employees, and then you have the retirees who are making up the second class? Correct, Your Honor. To be specific, the classes include employees that were hired before September 5, 2001, when the retiree health benefit was changed. And for new entrants after that point, they did not have this retiree health benefit. So, both classes represent individuals who were hired before that date. Class 1 is individuals who retired before January 1, 2007, before the retiree health benefit was purportedly eliminated by the interest arbitration award. And class 2 involves individuals who are now retirees or still active, but who were all active employees when the then-arbitration award purportedly changed the retiree health benefit. Okay. Let me ask you another question. Are there members of the class 1 plaintiffs who retired prior to the 1980 arbitration award? No, Your Honor. Are there members of the class 1 plaintiffs that retired before 1980? No, because under our claim, the retiree health benefit became part of the retiree health system as of the 1980 Dworkin Award. Okay. And how could you say that the complaint alleges claims independent of the CBAs if the health care benefits are provided for and governed by the agreement? Under the terms of the pension code, the terms of the retirement system are created through collective bargaining in the collective bargaining agreement. But the remedies that we are looking for here include remedies beyond simply breach of contract. They include remedies under the Illinois Constitution, the Retirement Benefits Clause, for example. And so just like, for example, if a collective bargaining agreement, a term in a collective bargaining agreement discriminated against certain employees because of race, it would be up to the employees would have a remedy in statutory discrimination laws, for example, or under the Constitution for discrimination. And it would be up to the court to interpret that collective bargaining agreement to determine what it says. And if it determines that it violates the Constitution or state law, the court would have the power to avoid enforcement of that agreement. Well, how do you address Section 7.5 of the Retirement Plan Agreement, which specifically states that the CTA doesn't have any obligation other than what's set forth in the agreement? Yes, Your Honor. That provision discusses what the contributions are from the CTA for the benefits provided by the capital plan. The capital plan is a defined term in the introductory paragraph of the collective bargaining agreement referring to the retirement and disability allowance plan. We do not dispute that the CTA's only responsibility for contributions for those disability and retirement allowances are its payments to the retirement plan fund, the contributions from Section 7, which includes its only responsibility for what the retirement plan is responsible for contributing for the retirement plan benefit under Section 20.12 is those contributions. But that is independent from the CTA's responsibility to provide retirees the retiree health benefit in the CTA's well-funded retirement plans that it gives to the active employees, which the CTA continued to do until 2009. And neither the retirement plan nor the CTA ever requested reimbursement or charged the retirees for that cost from 2003 forward. And we submit that if the CTA and retirement plan had no contractual obligation to pay millions of dollars per year for thousands of retirees through that period, they would not have done so, and that that creates an inference in our favor that the retirees had the contractual right to that benefit. Well, what in the retirement plan agreement makes it clear that the benefits are intended to outlast the termination of the CBAs? Yes, Your Honor. In the terms of the collective bargaining agreement, it is the provision in Section 20.12a, the second sentence that says this benefit terminates when the retiree attains age 65. Retirees can retire before age 65, many years before under the terms of the agreement, and their benefit continues to age 65 beyond the frequent three-year terms of the collective bargaining agreements. Is that included in every one of the CBAs, that provision, or just one? Your Honor, that's actually a fact question. We don't have in our possession every collective bargaining agreement going back to 1980. How do you address the argument that the retirement plan agreement contains a reservation of rights clause that defeats the vesting of retiree health care benefits? First, I would point out that none of those clauses is comparable to the clauses in the case law. If these clauses merely reflect the fact that under this plan, it's collective bargaining, the parties negotiate to create the plan, just like any collective bargaining agreement. It might be nearly universal that every collective bargaining agreement has a provision that says, before the term of the contract, the parties can renegotiate that. But that does not mean that the parties can renegotiate a vested benefit. And secondly, those provisions that the Court pointed to and that the defendants rely on as reservations of rights, they're not tied directly to the retiree health benefit. And therefore, if those provisions are reservations of rights that allow the parties to eliminate any benefit in the retirement plan, any benefit in the collective bargaining agreement, it would apply equally well to the retirement annuities, which is just an absurd result. Remember, this is not an ERISA case. We're not in federal court. This is not a private sector collective bargaining agreement, private employees. And therefore, the pension annuity would not be protected by the ERISA. And we contend in this litigation that both the pension annuity and the retiree health benefit are protected by what we have in Illinois to replace ERISA, the Illinois Retirement Benefits Clause, and that that provides automatic vesting at retirement as well. And so we would also contend that those provisions vested automatically when the employees join the system and they can no longer change that benefit after it's been installed in the system. I think you just kind of argued your point by trying to define the point at the same time. The question is, are these rights not vested because there's a reservation of rights clause? And your answer is, well, the reservation of rights clause can't have effect because they're vested. That's just like a circular argument. The question is, are the rights vested in the face of a reservation of rights clause? Your answer is, well, the cases that were cited by the defendants are different types of reservation of rights clauses. But my question is, do you have any authority that supports your position that this type of reservation of rights clause does not affect the question of vesting? Do you have any authority for that? Yes, Your Honor, I think we do. The bargaining provision that says the parties may modify or amend the agreement by giving others notice 60 days prior to the contract and modify the agreement, that provision, similar to that we cite in our brief, was considered by a Sixth Circuit opinion of the Weimer case, as well as the Marconi opinion, Marconi v. Joliet, decided by the Third District. To be clear, the court certainly did not consider those provisions as part of its holding. But in the facts of that case, it quoted a reopener provision and a plan modification provision. And in that decision, the court ultimately held that the plan did not unambiguously show that the retiree health benefit was not vested. What can you tell us about the two cases? Aren't there two cases pending right now regarding pension benefits before the Supreme Court? Your Honor, the Kenerva case, which was argued before the Supreme Court in September, that court, absolutely, the Supreme Court's decision in that case may be relevant to the issues here about whether the retirement benefits clause covers retiree health benefits. But this case is distinguished. Were they union employees? Yes, they were union employees. But the state health insurance benefit is provided very differently than the CTA retiree benefit clause here. The state employee benefit is provided by the State Employee Group Insurance Act, if I have that correct, which is in Title V of the compiled statutes. Well, in that case, there was no CBA, was there? Well, a CBA is involved, but under the State Employee Pension Clause, the state, the pension benefits are outlined in the pension code. The state employees don't have the right to negotiate over retiree benefits like the CTA employees do here. So the CBAs are different? The CBAs are different, correct. Did the trial, that was a direct appeal, wasn't it, from a trial court ruling? It was, Your Honor. And did that trial judge decide that the benefits had not vested? The trial judge in that case concluded that the retirement benefits clause does not cover the retiree health benefits in that case, and they took a direct appeal to the Illinois Supreme Court, correct, Your Honor? Well, tell me, why should we not follow the Seventh Circuit in its presumption against vesting retiree health care benefits? Your Honor, because part of that presumption is based in the private sector on looking into the ERISA law, where they find that under ERISA, pension benefits automatically vest, where ERISA welfare benefits do not automatically vest. There's no such distinction here in Illinois, and so the Seventh Circuit is not binding. And I think the Marconi decision, Marconi v. Joliet from the Third District, it considered these issues, including all the arguments I think raised by the defendants, and found that there was no basis to apply that Seventh Circuit anti-vesting presumption, whereas several policy reasons favor following a presumption in favor of vesting, including principally that retiree health benefits are a form of deferred compensation that workers earn by working for the system. And in this case, by making contributions to the retirement plan out of every paycheck, and to allow an employer to, after the workers have filled their deal. Are those contributions specifically set aside for health benefits, or are they being set aside for that pension benefit, the monetary benefit that accrues? It's a 3 percent contribution into the retirement plan assets. Those retirement plan assets are then used for both the annuity and the retiree health benefit. So it's not divided in the collective bargaining agreement, say 2.5 percent is for the annuity, 0.5 percent. Well, then where are you getting, where do you, how do you conclude that any percentage is going towards future medical health benefits? Because the way the retirement plan is funded is through contributions from the employer and from the participants. That's the only place where those assets of the retirement plan come from, and those assets then pay for the retirement benefit as well as the retirement annuity. Now, in terms of the retired employees, don't you see that their position is different than the current employees, those that are still working? I think that's right. There's case law, for example, if you did look at the hockey case, it shows there is something to be said about once a worker retires fully, the contract is completed as opposed to an active employee, and there are special issues with, and this is why there's the class. Well, that sort of helps the retired employees, doesn't it, in the sense that you really can't change the contract now that they're no longer represented really by anyone. Correct, Your Honor, and which is why there is the distinction between the class one and the class two employees. But I would also submit that under the retirement benefits clause, there actually should be no distinction between the two, because the long line of Supreme Court precedent says that the benefit, once the system provides the benefit, and notably the system doesn't have to provide an intent to vest above just providing the benefit, it vests on an employee's first day of work and cannot be later diminished. Just like the General Assembly could not later amend the pension code to diminish a benefit, the parties here who were granted their power by the General Assembly can't negotiate to diminish that benefit, even for the active employees. Your Honor, I would like to turn back and focus on the fact here that this case was dismissed on the pleadings in the face of allegations that for more than 25 years, the parties provided this retiree benefit at no cost to the employees. And that includes... You know, you're past your time, and maybe it might be best to reserve some time for rebuttal. Yes, Your Honor. Thank you, Your Honor. Let's hear from the defendants. Please, the court, counsel. Your Honor, I want to ask you a question about vesting right off the bat. Certainly. Doesn't Marconi suggest that we should impose a presumption in favor of vesting of retiree health care benefits? It does. And I guess there's two responses to that. One... Okay. Before you get to that, and doesn't the statement in the retirement plan agreement, which says that this benefit terminates when the retiree attains age 65, demonstrate a clear intent to vest? Isn't that the same language that the court used in the Hockey case? No, Your Honor. Okay. Well, show me why not. It's different. There's two things going on. Whether or not it vests and exactly what vests. What vests, as Judge Valderrama held, at most there was an expectation that there would be a premium paid, but the amount of premium paid would be kept. But our position is that it says the benefit terminates when the retiree attains age 65. Once the retiree attains age 65 during the term of the collective bargain agreement, subsection A is done and subsection B kicks in. If you look closely at Hockey and you look closely at the Aldi case that was cited, and I think also Roth, there was language that it must be provided until the retiree attains age 65. So there's a slight difference there, but a big difference. You mean the difference between until and when? Well, the difference being is that here you have subsection B, and you go with the presumption that at the end of the collective bargaining agreement, the benefits terminate and they can be modified. I mean, but where does that presumption you're talking about come from? The presumption comes from the Hockey case, and it comes from the Seventh Circuit cases cited in Hockey, and it comes from Judge Valderrama's decision in the Hockey, excuse me, the Seventh Circuit decision cited by Judge Valderrama. But I think more importantly, whether or not you apply the presumption in Marconi or the presumption in Hockey, our position is, quite frankly, it doesn't make a difference. Because even if you apply the Marconi presumption, Marconi presumes that benefits vest unless clearly state otherwise. And as Judge Valderrama found and as we've taken the position. So wouldn't there be a question of fact either way? No. Why not? Because the unambiguous language of Section 20.12a. And which language are you referring to? I'm referring to the language that says effective December 1, 1989, a sum will be paid in an amount sufficient to provide insurance coverage. Then it goes on to say, but said sum shall not exceed the premium cost of the plan effective for such coverage for retiree. And so with the other provision that says that they will not terminate until 65, you read that in combination with that so that the benefits that don't terminate are those that are capped. Is that what you're basically saying? That the insurance premium amounts are capped. Yes, they're capped. And those benefits won't terminate until the individual turns 65. Because they don't have them anyway after that age. But my question to you is why aren't there questions of fact? If you take those two together and your position would be? Well, there aren't questions of fact because it's unambiguous that there was a cap of the amount paid on the premiums. The amount paid on the premiums was capped at the amount paid on December 31, 2003. And as Judge Valderrama found, that was the most that the retirees could expect. Now what about the retirees? When did they agree to any of this?  If you look at Section 20.12a, it was effective December 1, 1989. And you have to remember that today's retirees were yesterday's active employees who controlled the union and voted on these things. And this is a collective bargaining agreement. That's one of the big differences, I think your Honor's pointed out, between this and this. So did every one of these retirees basically leave the CTA and become retired before any of these collective bargaining agreements were changed? I don't know the specifics of the class, but I don't think it makes a difference. Why not? Because the collective bargaining agreements, that's the whole idea of collective bargaining agreements, that you give up your rights and the unions collectively bargain for you. And here it's undisputed that the language says what it says. It's unambiguous. And it's undisputed that it was collectively bargained for. Yeah, but isn't that really for those people that are currently employed? I don't know that these individuals that are already retired are really being represented. Judge, I don't think I'll just back up. Marconi says that there's sort of a conflict in this whole idea between those that are retired and those that are currently working. Well, let's take this back. If you go back to when these agreements were collectively bargained for, the retirees were active employees. Some of this class includes former officers of the unions. And if you look at the other cases, the cases that we cited and the Council has cited, for example, the All Day case, which said premium free health insurance. Hockey said fully paid health insurance. And although Marconi, the plan wasn't included in there, the court did, I think, reference that the employer shall pay the cost. Now, this is a collectively bargained for agreement. The unions could have demanded, could have negotiated to have that language in here, fully paid premiums, full cost. They didn't. What they negotiated and what the parties agreed to was we're going to pay the premium, but we're going to cap it. That's the agreement that they have, and that's the agreement they have to live with. And Council wants to read in this fully paid health insurance, premium free health insurance, past December 31, 2003. So you can reconcile Marconi. Let's assume that we agree with the Marconi decision. How do you reconcile that with your position today? I reconcile because Marconi says that it's presumed to vest unless it clearly shows otherwise. And here, I think if you apply Marconi here, at most, at most, the vested benefits would be capped at the amount paid on December 31, 2003. So are you admitting, though, that there's a vested right to that extent? No. Our position, Your Honor, is, just as I stated briefly earlier, is that at most that's what they're entitled to. But the agreement here, particularly if you look at the reservation of rights provisions, Okay, so before we get to the reservation of rights, before we get to the reservation of rights, though, there's arguably a vested contractual right up to the amounts payable in 2003, right? That is an argument, yes. Okay. So has there been some analysis done as to, you know, how much that amount is versus this 45% reduction that we're facing? It has not. And, Your Honor, that argument has been raised. It was raised by counsel in their brief here. That wasn't alleged in their complaint and it wasn't raised before Judge Valderrama. But isn't that a question of fact? I mean, if there's arguably a vested right up to the amount of premiums in 2003 and this new modification reduces the benefit by 45%, doesn't somebody have to look at those numbers and see, you know, 2003 versus 55% and what's owed or nothing's owed? Judge, it's not a question of fact because no one injected that question of fact into the proceedings with Judge Valderrama. It's not in the complaint. It wasn't raised to Judge Valderrama. It was raised for the first time here on appeal. So I would say that's not a question of fact. Honestly, no one has done that analysis. I can't give you an answer one way or the other. Okay. I interrupted. You started talking about the reservation rights. Yes. Well, just getting back to why we believe that even Section 20.812 doesn't vest is if you look at the agreement as a whole with respect to the pension benefits, were the unions and the CTA specifically intended for rights to vest with the pension? They used the term for life. They used vesting section 11 specifically lays out vesting rules. Section 8 specifically says for life. So our position is if you read this as a whole, it's different than even hockey and that really nothing vests. But at most, at most, you have the cap on the benefits. Would you like me to discuss reservation rights? I'm very unclear how it's different than hockey. The difference is, Your Honor, is here that this benefit terminates when the retiree attains age 65. If you look at this as an agreement that only goes through the end of the collective bargain agreement and the December 31, 2003 date is important because the collective bargain agreement for 2004 kicked in on January 1, 2004. So if you consider this agreement in context that the CBA would end and the agreement and the party's benefits they're under other than pension would end, then you look at this as they have this right to health care subject to this cap. But during the time of the CBA, if the employee or retiree attains age 65, then section A no longer applies and section B applies. They go on Medicare. Okay. So your argument basically is that once the CBA terminates, everything terminates. Yes. Particularly if you apply the presumption that was included in hockey as opposed to the presumption of Marconi. If you want, I can discuss why. So when a CTA employee retires, their benefits are subject to the CBA and maybe they won't have any benefits when it terminates. That's what you're saying? That is what I'm saying, Your Honor. And that's the presumption that is in the Seventh Circuit by the cases that were cited in hockey and also by Judge Valderrama. And there's a difference here between health care and pension. And there's a difference why courts treat them differently. And this was discussed in the Mag case that's currently on appeal from the Illinois Supreme Court and Pool case, which was actually distinguished and rejected. The Roth case, which was relied on by Marconi. Marconi, the leave to appeal hasn't been allowed or denied. True? My understanding is they haven't made a decision yet. But the difference is pension benefits, you can look at those on an actuarial basis and figure those out. Here's the employee. Here's what we're going to pay them based on the plan. It's going to look like this. Health care benefits are much harder to plan for and that there's all these variables that go into there that make it very hard to plan. That's why traditionally health care benefits expire with the term of the CBA. And that's part of the reason why you have this presumption that they terminate with the plan. Well, doesn't the pension benefits terminate also if the CBA terminates? No, no, they do not. And the reason is if you look at the language of the pension plan, the CTA and the unions specifically use the word for life. They used vesting all over the agreement to describe pension benefits. The other reason is if you apply the Hockey Seventh Circuit presumption, the presumption is a twofold. It's one that pension benefits vest, but health care benefits do not vest. Doesn't the pension code also have a provision that allows for modifications when collective bargaining agreements are in place between the parties? Yes. And here that's part of the reason that the pension clause here doesn't apply because the pension clause only protects the vested benefits. In fact, the Burdell case – Well, our language just says benefits, doesn't it? It doesn't say vested, whereas Hawaii and Alaska have accrued benefits. Well, I'm sorry. Go ahead. The Supreme Court in Burdell noted, quote, the delegates clearly intended that vested rights of pension plan participants not be diminished. And the whole point of the pension clause was where the Illinois legislature, via the pension code, created benefits, pension benefits. They couldn't later reduce them. And this is on appeal, obviously, to the Supreme Court and one way or the other that decision will be made. But our position is that the pension clause only applies to pension benefits. Not health care. Not health care, yes. So let me ask you this question. So when a person comes to work for the CTA, you know, and they're advised what their benefits would be, are they told that those health care benefits could be taken away at any time? Judged. And let me add another part to it. When a person works 20, 30 years or whatever for the CTA and their time comes for retirement, you know, are they told that, you know, we may take away these health care benefits any time that we want to? I mean, are they told that, or do they rely on what the benefits are as part of their program? So when they become senior citizens, they know how much they're going to be able to live on. I mean, how is that done? I mean, there are people like everybody else, like you. Yes. Next guy. These are people we're dealing with who rely on things. So, I mean, what are they told? Judge, what the 14,000 retirees were each told, I can't tell you. There are some vague allegations in the complaint that they were told by unidentified people that they would have fully paid health insurance until they turned 65. But they're only entitled, the only reasonable thing to rely on, is the four corners of the plan and the collective bargaining agreements. So if a retiree relied on something else outside of those documents, it's not reasonable. And you have to remember, these are the parties to the plan in the CBA. It's the unions, and unions are sophisticated parties with counsel, and oftentimes, I'm getting a little bit out of the scope of the complaint here, but they issue written things describing what the benefits are. Okay. Does that answer your question, Your Honor? Yeah. So getting back... You know, what you characterize as vague allegations of the complaint, that certain promises were made, are those factual questions? Those aren't factual questions, Your Honor, for two reasons. One, if we're talking about equitable estoppel here, there's a complaint. Let me just correct that. There's a contract there, the collective bargaining agreements and the plan. And because there's a contract, equitable estoppel doesn't apply. With respect to changing the terms of the collective bargaining agreements and the plan via oral statements by undetermined people, it's our position, based on the collective bargaining agreement and the plan, are clear. They can only be amended by collective bargaining via written agreement by the unions and the CDA. They're fully integrated documents. So I think that's the whole point of the collective bargaining process, is that you have this one agreement that covers all 14-plus thousand retirees. And if you start looking at maybe one person was told by somebody that they had this, you open up the Pandora's box here. What about another area of estoppel? What about the course of dealings over the years where the payments were made over and above what you're now saying that you were contractually obligated to make? After you make those payments over a number of years, aren't you put in a position where people are relying on that and you're stopped from bringing it back? No, Your Honor, because the agreement is still unambiguous, and you can't inject ambiguity via extrinsic evidence. And course of performance, and even Marconi held this, course of performance is only relevant if there's ambiguity. And here, there's no ambiguity. It's unambiguous. But was the CTA paying into this until 2009? Were they making actual payments? No. The way it works, Your Honor, and counsel from the CTA is going to address this in a case-by-case basis, but the way it worked, my understanding is, that the CTA administered these and they sent an invoice to the plan and the plan then paid the CTA back for these costs. Okay. Then how do you explain plaintiff's allegations that the CTA has been paying for retiree health care benefits, bearing in mind that we must take that as true? Even if you take it as true, course of performance is only relevant if the language is ambiguous. Here, it's unambiguous. It says that the amount paid will be capped. And the agreements clearly state that they can only be amended by writing collective bargaining between the parties. If the CTA and the unions were all very sophisticated parties, intended to extend the cap beyond forever, fully paid, premium free, like these other cases used, they would have done that. They didn't do that. And I don't think, with all due respect, it's not a question of fact because it's unambiguous and you can't create a name. The cases are pretty clear. You can't create an ambiguity with extrinsic evidence. But can't you waive it, though? I mean, can't you put yourself in a position where you can't rely on the cap? Forget about ambiguity. I mean, there's a concept in the Stapler waiver that you can give up your right to assert a defense or you can give up your right to assert this limitation by not relying on it for a number of years. Judge? That has nothing to do with ambiguity. That has to do with a situation where we only have to pay this much, but you know what, we're going to keep paying this much. And then when you say, well, you know what, we only have to pay that much, the courts say, hey, you can't rely on that anymore. You went way past that. I don't know if you want to call that waiver or Staple or what. Judge? Probably waiver. Go ahead. Well, yeah. I mean, let's say it's waiver. I mean, the waiver is clear. It has to be shown clear and unequivocally. It has to be inconsistent with any other intention only to waive. Well, if you pay a lot more than you have to, isn't that an indication that you're paying more than you have to? No, because you have to remember. Shouldn't we assume that the government agency and the plan knows what its obligations are? Certainly. You have to remember, though, this is a collectively bargained for. Everything done here is done collectively with the unions and the CTA. And the interesting thing here, and this is all in the pleadings, is the 2004 collective bargaining agreement was set to start on January 1st, 2004. The cap in 20.12a was December 31st, 2003. And what happened was, and this is if you look at page A162, which is the execution page of the 2004 CDA, for whatever reason, the 2004 CDA was not executed until much later in December 2007. So under the CDA and under the plan, when the CDA ends and there's not a new collective bargaining agreement, the current benefits continue on as is until the parties collectively bargain for it and come up with a new agreement. And that's what they did here. So there's no waiver, but even then I think you go back, you have unambiguous language. And with all due respect, I don't think you can waive unambiguous language in a collective bargaining agreement that's fully integrated and requires any change to be made via writing. And plaintiffs have not cited a single case where non-vested rights were turned vested based on course of performance or some sort of oral agreement. It's always done in writing. That's because it's a collective bargaining agreement and both sides have to agree and both sides have to agree in writing. Okay. Let me ask you, what is your position on the employees who are not or are not members of the transit unions? Are they treated the same way as the union employees, as the plaintiff says? Are you talking about from a standing issue? From a standing issue. Counsel for the CDA has been a... I mean, how about those people? Are they treated just like the union members? In terms of... Is that your position? In terms of how, Your Honor, treated? In terms of standing, to start off. Well, the provisions of the contract, which was collectively bargained, apply to them also. That's, I think, the question. Yes. Counsel for the CDA, he's going to handle standing. If you want to... Oh, okay. All right. Do you have any more questions for me? Otherwise, if you want to... Let's hear from the CDA. Mr. Hoover. Thank you. Maybe we can start off and you can tell us about that. May it please the Court. Steve Wood again for the Chicago Transit Authority. If the question is whether non-union employees participate in the pension and health care benefits plan, yes, they do, and they participate on the same basis as the union employees. Okay. So you're saying the CBA applies to them? I'm saying that the pension plan, the retirement plan, which is a component of the collective bargaining agreement, applies to non-union employees as well, who meet the requirements of working for ten years and getting their vesting rights, et cetera. It's applied to them. Okay. So in this case, you know, it says they're all going to be treated the same way as the union employees. Correct. Well, why are the non-union employees? I can understand that they're bound by the pension code and the pension plan. Why are they bound by a collective bargaining agreement? Why are they? I don't understand that the plaintiff is arguing that there are different treatments between the unionized employees and the non-unionized employees so much as there's a difference in treatment between the retired employees and the current employees. I don't understand their complaint to be arguing. We want to know about it. It's an employee benefit that… Bound by a collective bargaining agreement. Again, they're not bound by the collective bargaining agreement. They're bound by the retirement plan that they choose to participate in. They can choose to participate in it. If they participate in it by giving, having contributions taken out of their paycheck to contribute to the plan, it's a contract that they are agreeing to participate in. Okay.  Again, the question of vesting, which my colleague here addressed, is separate and apart from the two ancillary issues that I'd like to address at this time, which is whether the CTA is a proper party in this case and whether current employees as opposed to retired employees have standing to assert the claims in this case. With respect to the proper party, even if the plaintiff's established that the health care benefit is a vested right, so even if they establish that, the CTA is not a proper party to this case. The CTA has not had any responsibility to pay any portion of the retired health care benefits since the 1980s, and it does not have that responsibility now. But it's been making payments up until 2009? That's not correct, Your Honor. One of the reasons that the Ogletree case, which was an unpublished Bill 23 order, was offered below and caused a bit of a back and forth, was to show that the CTA, in fact, was not paying for these benefits. It was billing the health care plan, the retirement plan, and being reimbursed. The CTA was self-administering its health care benefits, and so it would take out the portion of retiree or retirement health care that was covered by the retirement plan and seek reimbursement for that. So it was not, in fact, paying for that. Is that in the record, though? Sorry? Is that factual clarity in the record? It is. I mean, in the sense that when they raised this argument, we responded to it with our own argument. I mean, it really is just a question of they made the argument, we responded to the argument. And it's not just through the Ogletree date of decision. It's all the way through 2009. As far as the record goes, though, don't you have to have some sort of they allege in the complaint that the CTA has been making all these payments up until 2009? Isn't that one of their allegations? Don't you have to come with some contrary affidavit or something so that we know that what you've just told us is, in fact, accurate? In other words, that the CTA was simply billing and being reimbursed all along? We attempted to do that through the Ogletree decision. This was on a motion to dismiss. We showed that. We're not going to be looking at that. We showed that there was nothing in the agreements, on the face of the agreements, that requires the CTA. And to throw out an unsupported allegation, again, a factually unsupported allegation that the CTA has been paying for this, there's no way to address that other than to say it's an unsupported factual allegation. And under the case law, we're not bound to follow or accept as true an allegation unsupported by specific pay. Exactly. And that is really our point. All right. Well, if the CTA isn't paying, then how is this a pension and the benefits funded? The current employees are paying a minimum of 3% of their current salary into the plan. The CTA, as part of the pension reform legislation, that is part of the public act that we discussed, funded a $500 million bond and currently pays interest on the bond. But that is their only obligation is to pay the service on that bond. Well, if they're paying interest on the bond, which is paying for the benefits, then aren't they paying for basically they're paying a portion of the retiree health care benefits? No, Your Honor, we would disagree with that. The language in the contract specifically says the retirement plan has sole responsibility to pay for the health care benefits that are sought. It does not say, and in fact it says that the authority. Well, how would the plan fund it unless the CTA pays for it in one way or another, either through a bond or something else? Because the employees are paying. The current employees are contributing 3% of their salary designated specifically for the health care fund. But is that enough money to fund it? It is, Your Honor. There's no allegation that the plaintiffs have made here that there's not sufficient funding here. No, but the CTA put up a bond, and they're paying the interest on the bond, aren't they? That is my understanding. Again, this is not part of the plaintiff's case. But my understanding is, and this is a public record, the CTA pensions annual reports are on their website. My understanding is there's not a funding issue, that the funding crisis was resolved by this one-time contribution, and that they are going forward solely based on the contributions of the employees, the current employees. But if they ran out of money, then the bond would have to pay it, wouldn't it? Then the CTA would have to reimburse under the bond. I'm not clear on what the obligations are under that bond. I don't think that's anything that the plaintiffs have raised. Again, the whole idea of insufficient funding is not part of the plaintiff's complaint. Okay. The plaintiff's complaint focuses on the whole thing. I understand that. I'm just asking to get a clear picture of the whole thing. I wanted to address just this morning. What was the initial purpose of this bond? It was to fund, provide capital for the health care trust. So in 2006, the legislature ordered the CTA to separate its health care and pension into separate funds. As part of funding the health care side, the CTA agreed to this capital infusion, which then established the health care as a separate entity to administer those funds without any additional contribution by the Chicago Transit Authority. I did want to address a question you had initially for plaintiff's counsel with respect to Section 7.5. And I believe his response, Section 7.5 says that all payments and benefits provided for the plan shall be made from the fund, and there should be no ongoing continuing obligation of the authority. And it addresses the question you just raised before. And in response, plaintiff's counsel said that the plan was a defined term and only applied to the pension side, not to the health care and benefits side. And that's simply not true. If you look on page 116 of the collective bargaining agreement, the plan in quotes is actually in an introductory paragraph that says that it is sometimes used to refer to the pension side. But then on the same page, the definition section begins. And in the definition section, there is no defined term in this agreement called the plan. There's something called the fund, but nothing called the plan. Does the plan allow for modifications to health care benefits specifically? You know, again, this sort of goes back to the vesting, but it's certainly our position that plaintiff's counsel, I mean, plaintiff's counsel adequately address the issue that it does, that it does offer that modification. Finally, as a result, even if it was not clear that the pension itself, the language of the pension. But it's modification by mutual assent, isn't it? Between the union and the Chicago Transit Association. How does a retiree who is no longer represented by the union assent to a modification? Well, again, this really relates more to the plan's arguments and the plan's side. But from our perspective, the agreement or the benefit that they agreed to was contingent. It was the benefit that they agreed to at the time they agreed to the collective bargaining agreement. And because of the reservation of rights and other language in the collective bargaining agreement, the retirement plan, it was subject to change in the future. So if the thing that they agreed to was subject to change in the future, there should not have been a tremendous amount of reliance that it was going to be the exact words. But the only thing that's subject to agreement in the future are health benefits, as opposed to the monetary amount that someone received. Precisely. Precisely. We've never taken the position that the monetary pension annuity was subject to diminishment. I mean, that's really their position, that it's a diminishment issue. And finally, as a result of the amendments to the pension code in the wake of the Benn Arbitration Award, the Public Act 95708 also stated that the CT has no obligation to fund health care benefits portion of this agreement. If there are no further questions about the public party issue, I just want to briefly, very briefly address the issue of standing to sue. The retirement plan is part of the collective bargaining agreement, and the only parties that can challenge the collective bargaining agreement are the CTA and the unions. The trial court correctly held that the unions were the bargaining representatives of the employees and only unions can assert those rights. Plaintiffs rely on some retaliatory discharge cases and very specific types of cases where individuals are asserting individual rights under statutes. But this case does not resemble those cases because this is an individual asserting a right that only exists in the context of a collective bargaining agreement. They don't have health care benefits that they're asserting outside the four corners of this contract. This is, again, not an individual rights case. It's a collective bargaining agreement case. And if there are no further questions, I will simply ask that this court affirm the decision of the circuit court which dismiss plaintiffs' complaint against the CTA and the other plan defendants. Thank you. Okay. Okay, let's have a brief rebuttal because you're way past your time. And just address, you know, what was our... Why don't you address Mr. Wood's last comment that the current employees have no standing to challenge the plan, only the union, their representative, does? Yes, Your Honor. I think this returns back to where we began the argument that the collective bargaining agreement, they created this right under the terms of the pension code. But the remedy that the current employees... Where in the pension code does that... And then the retiree health benefit, just like the annuity, was then created via that collective bargaining in the party's contract. And as counsel for CTA stated, CTA then applies that retirement plan to the other employees. Isn't the plan administering all this? You say the CTA, but the plan is really administering everything, isn't it? Except for the fact that the benefit that the retirees receive is access to the self-funded health plan that the CTA provides to its active employees, which we think gets to also the point of when we say the CTA continued to provide this benefit through 2009, well after December 31st, 2003, that's what they were continuing to do. Let me ask you this. Under a collective bargaining agreement, can't that agreement, when it ends and a new one is negotiated, aren't there changes that occur all the time? Yes, Your Honor. And aren't those individual employees subject to those changes after the union representing them bargains and agrees to modifications, changes, et cetera? Yes, Your Honor, but not when the right that was created before the renegotiation was already vested. Doesn't the pension code itself provide for modifications under a collective bargaining agreement? Yes, Your Honor. So how do these current employees, aren't they subject to these bargaining agreements that are negotiated on their behalf by the unions? I'm not talking about the retired individuals now. I'm specifically focused on current employees. Right, Your Honor. I think, one, I think the individuals who are not represented by the transit unions, and so, for example, the transit unions do not owe them a duty of fair representation. Forget about the non-representative. But individuals who were members of the transit unions, I think the difference is that they're allowed to do the modification but not to a vested benefit. I think it's equivalent as we described. That, again, goes back to the whole question of whether that's circular. I mean, you say you can't modify a vested benefit, but the question is, is a benefit vested if it's modifiable? Well, but it gets to what makes the vested benefit modifiable in the first place. Well, I don't understand how you could ever change anything then as far as health care. Well, you can change it in a way that doesn't diminish rights, or you could change it, for example, to eliminate the benefit entirely for individuals who are not participants in the system before the change was made. But just like the General Assembly always has a right to amend and modify the pension code, the Retirement Benefits Clause states you can't do that and then apply that change if it's a diminishment to a current participant. In the private sector, all the time, collective bargaining agreements negotiate pension benefits, and then in that context, it's ERISA that says you can't change the pension benefit. Well, but they're arguing, I think, in response to the diminishment and the constitutional clauses it's not a diminishment if you understand at the outset that it's modifiable. And a health benefit is not the same as the annuity you receive for working, say, 20 years. Well, on the first point, which I think is the same, is I don't think it clearly says that it is modifiable. That provision is not tied directly to the retiree health benefit. It's the General Modification Clause for a collective bargaining agreement, which is universally in collective bargaining agreements, but then to interpret that with the language that this benefit terminates at age 65, going beyond it. And then if you look at that and think about the ambiguity and think about the fact that it's under Marconi, it should be their burden to show it's unambiguous. Look at the party's course of dealing. If they had no contractual obligation to continue this benefit after December 31, 2003, why did they continue to spend millions of dollars to do it? Well, their response is that they haven't been spending millions of dollars. That their response is that they have made the bills to the plan. The plan has reimbursed them during this entire time frame. And that your allegation is one that is unsupported by any specific fact so that we can disregard or not accept as true that one allegation regarding the CTA. Well, I think it is a specific fact that alleges that they continue to provide this benefit through 2009. Now, does the second clause of the first sentence of Section 20.12A suggest that it's the retirement plan that reimburses the CTA for the cost of this benefit? We think that's true. Does that provision appear to cap what the retirement plan has to reimburse to the CTA? We think that clause could be interpreted that way. But then when you look at the plan, if you take CTA's argument and if it is true what they're saying, and we think it might, we think that could be the case, then the retirement plan was, of course, spending much more than that beyond December 31, 2003. But remember, what's also being provided is it's not just a payment for cost. It's also a benefit being provided, which is undisputably was being provided until 2009 in the CTA employees' active self-funded health plans protected by the... Would you agree that the current CTA employees could have filed an unfair labor practice against the transit union? I think for part of these, for part of the issues, they could have. But they didn't. But they did not, correct. And refresh us again, why they have standing, the union employees, why they have standing instead of the union itself. Because part of these provisions here, remember, it's also claims against the retirement plan and claims against CTA, but for constitutional remedies that exist independent of the CTA. The cases that they cite for union employees not having standing are cases against their employer only under issues... Well, the retaliatory discharge case certainly isn't analogous to this. Well, Your Honor, what we believe is that what that shows is that when there is a legal remedy independent of breach of contract, just like retaliatory discharge is a legal remedy independent of collective part of the contract, here the retirement benefits clause is a legal remedy that the state of Illinois provides to employees independent of the remedy for breach of contract that is covered by the Illinois Public Labor Relations Act or the Uniform Arbitration Act. But when these benefits are specifically bargained for, how do you reconcile that? If these are the things that are constantly negotiated with each collective bargaining agreement, I don't understand that logic that then they have standing. But the fact of the matter is that they're constantly being negotiated in a collective bargaining agreement that lasts for only a certain period of time and then they're renegotiated. Correct, Your Honor. So take, for example, if a collective bargaining agreement, the union and employer negotiated that a certain group of employees would now make $10 an hour. And all of a sudden in the next contract they negotiated that certain group of employees that all happened to be African American would be paid $8 an hour. Now those African American employees could certainly go to the state courts and say a right that I had in my collective bargaining agreement was taken away in a discriminatory manner and I have a remedy under Title VII or under the Illinois Human Rights Act or what have it be. This isn't really that kind of a claim, though. It's not a claim of discrimination because it's across the board. Everyone is saying that their benefits have been diminished. Well, we think, frankly, the Retirement Benefits Clause is a policy of Illinois that should be given the same weight as those other policies. On the question of promissory estoppel, this wasn't argued in the briefs, but isn't there a body of law that warns against imposing an estoppel on a government agency or on an agency that represents large bodies of people such as the plant? Isn't there a general preclusion against imposing estoppel on a government? I don't know. Well, aren't the elements, in fact, different when you try to impose estoppel against a municipal corporation as opposed to the individual or any private corporation? They are. The burden is substantially different. We'll admit the promissory estoppel claim is, in all honesty, a fallback position, of course. But we think that those claims, the allegations, in addition to going towards a promissory estoppel claim, we think it should also be considered when the court considers what presumptions to apply here. Because when a contract is, at worst, ambiguous to a worker, a bus driver, or a train operator as to what benefit they have, what the CTA and the retirement plan continue to represent to them, and then to be able to say, under this Reservations of Rights Clause, that's not anywhere near the retirement benefit, doesn't specifically reference this retiree health benefit, and we're telling you, you're going to have this until age 65. You can make your decision to irrevocably retire and have a fixed income, but then to come around and say, we can change that and effectively take your entire annuity away by increasing the cost of the retiree health benefit, which to some members of the class is effectively what ended up happening. And if the court doesn't have any other questions, I will conclude. Thank you, Your Honor. All right. Well, I thank all of you. The briefs were good, and the oral arguments were very good. And we will take this case under advisement, and we will now take a recess as we change panels. Thank you all for your comments and briefs.